11-788-cv
WPIX v. ivi

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2011

(Argued: May 30, 2012     Decided: August 27, 2012)

Docket No. 11-788-cv

————————————————

WPIX, INC., WNET.ORG, AMERICAN BROADCASTING COMPANIES, INC.,
DISNEY ENTERPRISES, INC., CBS BROADCASTING INC., CBS STUDIOS,
INC., THE CW TELEVISION STATIONS, INC., NBC UNIVERSAL, INC.,
NBC STUDIOS, INC., UNIVERSAL NETWORK TELEVISION, LLC, TELEMUNDO
NETWORK GROUP, LLC, NBC TELEMUNDO LICENSE COMPANY, OFFICE OF THE
COMMISSIONER OF BASEBALL, MLB ADVANCED MEDIA, L.P., COX MEDIA
GROUP, INC., FISHER BROADCASTING-SEATTLE TV, L.L.C., TWENTIETH
CENTURY FOX FILM CORPORATION, FOX TELEVISION STATIONS, INC.,
TRIBUNE TELEVISION HOLDINGS, INC., TRIBUNE TELEVISION NORTHWEST,
INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK
LIMITED PARTNERSHIP, TELEFUTURA NETWORK, WGBH EDUCATIONAL
FOUNDATION, THIRTEEN, AND PUBLIC BROADCASTING SERVICE,

*Plaintiffs-Appellees*,

v.

IVI, INC., AND TODD WEAVER,

*Defendants-Appellants*.

————————————————

Before:

WINTER, CHIN, and DRONEY, *Circuit Judges*.

————————————————

Appeal from a judgment of the United States District Court for the Southern District of New York (Buchwald, *J.*) granting plaintiffs-appellees' motion for a preliminary injunction and holding that defendant-appellant ivi, Inc. -- a company that streams television programming live and over the Internet -- is not a "cable system" under § 111 of the Copyright Act of 1976, 17 U.S.C. § 111.

AFFIRMED.

---

ROBERT ALAN GARRETT (Peter L. Zimroth, Hadrian R. Katz, Lisa S. Blatt, C. Scott Morrow, R. Reeves Anderson, *on the brief*), Arnold & Porter LLP, New York, New York, and Washington, D.C., *for Plaintiffs-Appellees*.

LAWRENCE D. GRAHAM (Ellen M. Bierman, *on the brief*), Black Lowe & Graham PLLC, Seattle, Washington, *for Defendants-Appellants*.

---

CHIN, *Circuit Judge*:

In this case, plaintiffs-appellees -- producers and owners of copyrighted television programming -- sued defendants-appellants ivi, Inc. ("ivi") and its Chief

Executive Officer, Todd Weaver, for streaming plaintiffs' copyrighted television programming over the Internet live and without their consent. The district court granted a preliminary injunction for plaintiffs, holding that: (1) plaintiffs were likely to succeed on the merits of the case because ivi was not a "cable system" entitled to a compulsory license under § 111 of the Copyright Act, 17 U.S.C. § 111; (2) plaintiffs would suffer irreparable harm without injunctive relief; (3) the balance of hardships favored the grant of a preliminary injunction; and (4) the issuance of a preliminary injunction did not disserve the public interest. Defendants appeal. For the reasons that follow, we affirm.

### STATEMENT OF THE CASE

### 1. The Facts

The following facts are undisputed.

On September 13, 2010, ivi began streaming plaintiffs' copyrighted programming over the Internet, live,

for profit, and without plaintiffs' consent.[1]  ivi began by retransmitting signals from approximately thirty New York and Seattle broadcast television stations; by February 2, 2011, ivi was also retransmitting signals from stations in Chicago and Los Angeles.[2]  Within five months of its launch, ivi had offered more than 4,000 of plaintiffs' copyrighted television programs to its subscribers.

---

[1]     "Streaming" generally involves compressing a file to a size small enough to be transmitted over the Internet and then allowing the receiving computer to start playing packets of the file while the remaining packets are being transmitted.  Preston Gralla, How The Internet Works 229-31 (7th ed. 2004).  ivi's technology further "encrypts" the transmitted content -- that is, ivi encodes the content so that it cannot be viewed as it is transmitted over the Internet; ivi then "decrypts" or decodes the content back into a viewable format in small increments or packets shortly before it appears on a given subscriber's screen. *See id.* at 98-99.

ivi can also transmit data "peer-to-peer."  "Peer-to-peer" configurations allow people to share files between computers over the Internet. *Id.* at 225.  ivi's subscriber license agreement includes a section permitting ivi to use subscriber computers and bandwidth to enable peer-to-peer viewing.  According to Weaver, however, ivi has not used a peer-to-peer configuration as of October, 2010.

[2]     "Broadcast" television programming generally refers to programs "originally propagated by traditional over-the-air television signals for receipt by antenna." *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 601 n.1 (D.C. Cir. 1988) ("*MPAA*").  "Cable" television programming or "non-broadcast" programming refers to programs "produced solely for cable systems and disseminated only through them." *Id.*

Specifically, ivi captured and retransmitted plaintiffs' copyrighted television programming live and over the Internet to paying ivi subscribers who had downloaded ivi's "TV player" on their computers for a monthly subscription fee of $4.99 (following a 30-day free trial). For an additional fee of $0.99 per month, subscribers were able to record, pause, fast-forward, and rewind ivi's streams.

Almost immediately after ivi's launch, several affected program owners and broadcast stations sent cease-and-desist letters to ivi. ivi responded to these letters on or about September 17, 2010, purporting to justify its operations on the ground that it was a cable system entitled to a compulsory license under § 111 of the Copyright Act, 17 U.S.C. § 111.

## 2. *Proceedings Below*

On September 20, 2010, ivi filed a declaratory action in the United States District Court for the Western District of Washington. On September 28, 2010, plaintiffs sued defendants for copyright infringement in the Southern

-5-

District of New York, seeking damages and injunctive relief. On January 19, 2011, the United States District Court for the Western District of Washington (Robart, *J*.) dismissed ivi's declaratory action as an impermissible anticipatory filing. *See ivi, Inc. v. Fisher Commc'ns, Inc.,* No. C10-1512JLR, 2011 WL 197419 (W.D. Wash. Jan. 19, 2011).

On February 22, 2011, in a thorough and carefully-considered decision, the United States District Court for the Southern District of New York (Buchwald, *J*.) granted plaintiffs' motion for a preliminary injunction. *See WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 622 (S.D.N.Y. 2011). This appeal followed.[3]

## DISCUSSION

We review a district court's grant of a preliminary injunction for abuse of discretion. *Kickham Hanley P.C. v. Kodak Ret. Income Plan*, 558 F.3d 204, 209 (2d Cir. 2009). A district court abuses its discretion in

---

[3] On April 18, 2011, the district court denied ivi's motion for a stay pending appeal. On July 28, 2011, this Court denied ivi's motion for a stay on the ground that ivi had failed to demonstrate a likelihood of success on the merits.

-6-

granting a preliminary injunction when its decision rests on an error of law or a clearly erroneous factual finding, or when its decision cannot be located within the range of permissible decisions. *Id*. In a copyright case, a district court may grant a preliminary injunction when plaintiffs demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) a balance of the hardships tipping in their favor; and (4) non-disservice of the public interest by issuance of a preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010). We discuss each prong of *Salinger* in turn.

## I.  *Likelihood of Success on the Merits*

Under the Copyright Act, television broadcasters "generally [have] 'exclusive rights' . . . to authorize the public display of [their] copyrighted content, including the retransmission of [their] broadcast signal[s]." *EchoStar Satellite L.L.C. v. F.C.C.*, 457 F.3d 31, 33 (D.C. Cir. 2006); *see* 17 U.S.C. § 106(4)-(5). Congress, however, codified an exception to this exclusive right in 1976 --

§ 111 of the Copyright Act -- permitting cable systems to publicly perform and retransmit signals of copyrighted television programming to its subscribers, provided they pay royalties at government-regulated rates and abide by the statute's procedures. *See* 17 U.S.C. § 111(c) (exception), (d) (royalties); U.S. Copyright Office, *Satellite Home Viewer Extension and Reauthorization Act Section 109 Report* 1 (2008) ("SHVERA Report").

In this case, it is undisputed that plaintiffs owned valid copyrights to the television programming that ivi publicly performed without plaintiffs' consent. *See ivi*, 765 F. Supp. 2d at 601. The burden of proof thus falls on defendants to demonstrate that they have an affirmative statutory defense to copyright infringement. *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) (noting possession of license by accused infringer is affirmative defense and burden falls on licensee to prove license's existence (citing *United States v. Larracuente*, 952 F.2d 672, 674 (2d Cir. 1992); Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01)). Indeed, defendants argue

that ivi is a cable system entitled to a § 111 license under the Copyright Act.

Thus, the principal issue presented is whether ivi, a service that streams copyrighted television programming live and over the Internet, constitutes a cable system under § 111 of the Copyright Act. If so, ivi has a statutory defense to plaintiffs' claims of copyright infringement, and ivi is entitled to a compulsory license to continue retransmitting plaintiffs' programming. *See Satellite Broad. and Commc'ns Ass'n of Am. v. Oman*, 17 F.3d 344, 345-46 (11th Cir. 1994). If not, ivi has no defense to plaintiffs' claims of infringement. *See id.* at 346.

As discussed below, the Copyright Office -- the federal agency charged with overseeing § 111 -- has spoken on the issue of whether § 111's compulsory licenses extend to Internet retransmissions. Accordingly, we utilize the two-step process outlined in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). At *Chevron* step one, we consider whether Congress has clearly spoken on the issue of Internet retransmissions in § 111. *See id.* at

842-43; *Cohen v. JP Morgan Chase &* Co., 498 F.3d 111, 116 (2d Cir. 2007). If the intent of Congress is clear, that is the end of the matter; courts "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If we determine that Congress has not directly addressed the precise question at issue, we proceed to *Chevron* step two, "which instructs us to defer to an agency's interpretation of the statute, so long as it is 'reasonable.'" *Cohen*, 498 F.3d at 116 (quoting *Chevron*, 467 U.S. at 843-44).

A.  ***Chevron Step One***

To ascertain Congress's intent at *Chevron* step one, we begin with the statutory text; if its language is unambiguous, no further inquiry is necessary. *Cohen*, 498 F.3d at 116 (citing *Zuni Pub. Sch. Dist. v. Dep't of Educ.*, 550 U.S. 81, 93-94 (2007); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005)). If the statutory language is ambiguous, we look to the canons of statutory construction, and then to the legislative history to see

whether any "'interpretive clues' permit us to identify Congress's clear intent."  *Cohen*, 498 F.3d at 116 (citing *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 586 (2004); *accord Daniel*, 428 F.3d at 423).

## 1.    *The Statutory Text*

Section 111(c)(1) of the Copyright Act provides:

> [S]econdary transmissions to the public by a cable system of a performance or display of a work embodied in a primary transmission made by a broadcast station licensed by the Federal Communications Commission . . . shall be subject to statutory licensing upon compliance with the requirements of subsection (d) where the carriage of the signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

17 U.S.C. § 111(c)(1).[4]  A "cable system" is defined as:

> a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission,

---

[4]    A "secondary transmission" is defined as "the further transmitting of a primary transmission simultaneously with the primary transmission."  17 U.S.C. § 111(f)(2).

-11-

and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.

17 U.S.C. § 111(f)(3).[5]

Based on the statutory text alone, it is simply not clear whether a service that retransmits television programming live and over the Internet constitutes a cable system under § 111. That is, it is unclear whether such a service (1) is or utilizes a "facility" (2) that receives and retransmits signals (3) through wires, cables, microwave, or other communication channels. *See* 17 U.S.C. § 111(f).[6]

---

[5] "A cable system's 'headend' is its control center, from which a cable company receives signals and then transmits them, by coaxial cable, to the company's subscribers." *Oman*, 17 F.3d at 347 n.5 (citing, *inter alia*, *E. Microwave, Inc. v. Doubleday Sports, Inc.*, 691 F.2d 125, 128 (2d Cir. 1982)).

[6] ivi argues that it "plainly has a 'facility' as required" by § 111. Reply Br. of Defs.-Appellants at 2. ivi explains that the Internet is not "the only equipment at issue here." *Id.* at 3. Rather, "the primary transmissions are

Among other things, it is certainly unclear whether the Internet itself is a facility, as it is neither a physical nor a tangible entity; rather, it is "a global network of millions of interconnected computers." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 403 (2d Cir. 2005) (internal quotation marks omitted); *see also Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1188-89 (Fed. Cir. 2003); *ACLU v. Reno*, 929 F.Supp. 824, 830, 832 (E.D. Pa. 1996) ("[The Internet] exists and functions [because] hundreds of thousands of separate operators of computers and computer networks independently decided to use common data transfer protocols to exchange communications and information with other computers. . . . There is no centralized storage location, control point, or communications channel for the Internet . . . ."), *aff'd*, *Reno v. ACLU*, 521 U.S. 844 (1997). When content is viewed over the Internet, the viewing computer

received by physical encoder hardware, located in a state, then retransmitted from a headend also located in a state." *Id.* ivi, however, has not identified the location or nature of its facility.

typically receives information from several different servers.  *See Akamai*, 344 F.3d at 1189.  Additionally, the growth of "cloud-based systems," or virtual platforms where content resides remotely on a distant server, further highlights the uncertainty as to whether an Internet retransmission service is or utilizes a facility that receives and retransmits television signals.  *See Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency*, 678 F.3d 926, 929 n.1 (D.C. Cir. 2012).

As Congress's intent is not apparent from the statutory text, we turn to § 111's legislative history to see if any "interpretive clues permit us to identify Congress's clear intent" as to whether ivi constitutes a cable system under § 111.  *See Cohen*, 498 F.3d at 116 (internal quotations marks ommitted).

## 2.  *Legislative History*

Cable systems were built in the late 1940s to bring television programming to remote or mountainous communities and households that could not receive over-the-air broadcast television signals because of their geographic

-14-

location.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 627 (1994) (citing *United States v. Sw. Cable Co.*, 392 U.S. 157, 161-64 (1968); D. Brenner, M. Price & M. Meyerson, *Cable Television and Other Nonbroadcast Video* § 1.02 (1992); M. Hamburg, *All About Cable*, Ch. 1 (1979)); *see* SHVERA Report, *supra*, at 2.

In 1968 and 1974, before Congress passed the Copyright Act of 1976, the Supreme Court held that retransmissions of broadcast programming by cable systems did not constitute copyright infringement under the Copyright Act of 1909 because such retransmissions were not performances.  *See Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974), *superceded by* 17 U.S.C. § 111, *as recognized in Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 709-10 (1984); *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968) (same).  As a result, cable systems were able to retransmit broadcast television programming without obtaining licenses or incurring any fees.  The *Teleprompter* Court, however, concluded that "if the Copyright Act of 1909 was inadequate

to govern the commercial relationships that had emerged in the interim, it was for Congress to create a substitute." *MPAA*, 836 F.2d at 602 (citing *Teleprompter*, 415 U.S. at 414).

In 1976, Congress responded to the Supreme Court's decisions by enacting § 111. Balancing two societal benefits, Congress enacted § 111 to enable cable systems to continue providing greater geographical access to television programming while offering some protection to broadcasters to incentivize the continued creation of broadcast television programming. SHVERA Report, *supra*, at 4; *see Crisp*, 467 U.S. at 710-11 ("Compulsory licensing not only protects the commercial value of copyrighted works but also enhances the ability of cable systems to retransmit such programs . . . thereby allowing the public to benefit by the wider dissemination of works carried on television broadcast signals."); *E. Microwave*, 691 F.2d at 132; *MPAA*, 836 F.2d at 602. Section 111's compulsory license thus enabled cable systems to bypass the transaction costs and impracticalities of negotiating individual licenses with dozens of copyright

owners, while simultaneously ensuring that copyright owners were compensated. *See Crisp*, 467 U.S. at 711 & n.15; SHVERA Report, *supra*, at 3-4.

In 1991, the Eleventh Circuit held that a satellite carrier was a cable system covered by § 111's compulsory licensing scheme. *See Nat'l Broad. Co., Inc., v. Satellite Broad. Networks, Inc.*, 940 F.2d 1467, 1471 (11th Cir. 1991), *superceded by* 17 U.S.C. § 119, *as recognized in Oman*, 17 F.3d 344; *see also EchoStar*, 457 F.3d at 33-34. In 1998, rather than incorporate satellite technology as a communications channel under § 111, Congress responded to the Eleventh Circuit's decision by codifying a separate statutory license for satellite carriers under § 119 of the Copyright Act. See 17 U.S.C. § 119 (the Satellite Home Viewer Act of 1988 ("SHVA")). In 1999, Congress noted that in "creating compulsory licenses, it is acting in derogation of the exclusive property rights granted by the Copyright Act to copyright holders, and that it therefore needs to act as narrowly as possible to minimize the effects of the government's intrusion on the broader market in which the

affected property rights and industries operate."  S. Rep. No. 106-42, at 10 (1999); *cf. Tasini v. N.Y. Times Co.*, 206 F.3d 161, 168 (2d Cir. 2000) (Where the Copyright Act "sets forth exceptions to a general rule, we generally construe the exceptions 'narrowly in order to preserve the primary operation of the provision.'" (alterations omitted) (quoting *Commissioner v. Clark*, 489 U.S. 726, 739 (1989))).

Finally, in 1994, Congress expressly included "microwave" as an acceptable communications channel for retransmissions.  *See* 17 U.S.C. § 111(f)(3).  Congress has not codified a statutory provision for Internet retransmissions, nor has it included the "Internet" as an acceptable communication channel under § 111.[7]

---

[7]  Toward the end of Congress's last session in 2000, an amendment was proposed to clarify that § 111 does not apply to broadcast retransmissions over the Internet. *Copyrighted Broadcast Programming on the Internet:  Hearings Before the Subcomm. on Courts and Intellectual Prop. of the House Comm. on the Judiciary*, 106th Cong. (2000) (statement of Marybeth Peters, Register of Copyrights).  For indiscernible reasons, the amendment was ultimately removed from the legislation.  *See id.*

### 3. *Legislative Intent*

The legislative history indicates that Congress enacted § 111 with the intent to address the issue of poor television reception, or, more specifically, to mitigate the difficulties that certain communities and households faced in receiving over-the-air broadcast signals by enabling the expansion of cable systems. *See Turner*, 512 U.S. at 627; *Crisp*, 467 U.S. at 710-11; *E. Microwave*, 691 F.2d at 132; *MPAA*, 836 F.2d at 602; SHVERA Report, *supra*, at 1, 3.

Through § 111's compulsory license scheme, Congress intended to support localized -- rather than nationwide -- systems that use cable or optical fibers to transmit signals through "a physical, point-to-point connection between a transmission facility and the television sets of individual subscribers." *Turner*, 512 U.S. at 627-28 (citing *Cmty. Commc'ns Co. v. Boulder*, 600 F.2d 1370, 1377-78 (10th Cir. 1981)).[8]

---

[8] The statute's reference to "contiguous communities," and a "headend" in defining a cable system also indicates that Congress intended to direct § 111's license at localized -- rather than national -- retransmission services. *See* 17 U.S.C. § 111(f).

-19-

Congress did not, however, intend for § 111's compulsory license to extend to Internet transmissions. Indeed, the legislative history indicates that if Congress had intended to extend § 111's compulsory license to Internet retransmissions, it would have done so expressly -- either through the language of § 111 as it did for microwave retransmissions or by codifying a separate statutory provision as it did for satellite carriers. *See* 17 U.S.C. §§ 111, 119.

Extending § 111's compulsory license to Internet retransmissions, moreover, would not fulfill or further Congress's statutory purpose. Internet retransmission services are not seeking to address issues of reception and remote access to over-the-air television signals. They provide not a local but a nationwide (arguably international) service.

Accordingly, we conclude that Congress did not intend for § 111's compulsory license to extend to Internet retransmissions. To the extent that there is any doubt as to Congress's intent, however, we proceed to *Chevron* step

two, and we conclude that the position of the Copyright

Office eliminates such doubt in its entirety.

B.    *Chevron Step Two*

The Copyright Office is the administrative agency

charged with overseeing § 111's compulsory licensing scheme.

*See* 17 U.S.C. § 111(d); *Oman*, 17 F.3d at 347; *MPAA*, 836 F.2d

at 608.  Although Congress has not expressly delegated

authority to the Copyright Office to make rules carrying the

force of law, "agencies charged with applying a statute

. . . certainly may influence courts facing questions the

agencies have already answered."  *United States v. Mead

Corp.*, 533 U.S. 218, 227 (2001).  To determine the

appropriate amount of deference to an agency administering a

statute, "courts have looked to the degree of the agency's

care, its consistency, formality, and relative expertness,

and to the persuasiveness of the agency's position."  *Id.* at

228 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140

(1944)).  The weight accorded to the Copyright Office's

interpretations "'depend[s] upon the thoroughness evident in

its consideration, the validity of its reasoning, its

consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Id.* at 228 (quoting *Skidmore*, 323 U.S. at 140); *see also Morris v. Bus. Concepts, Inc.*, 283 F.3d 502, 505-06 (2d Cir. 2002); *Oman*, 17 F.3d at 345.

The Copyright Office has consistently concluded that Internet retransmission services are not cable systems and do not qualify for § 111 compulsory licenses. In 1997, the Copyright Office concluded that Internet retransmission services, "so vastly different from other retransmission industries now eligible for compulsory licensing[,]" were not entitled to a § 111 compulsory license. U.S. Copyright Office, *A Review of the Copyright Licensing Regimes Covering Retransmission of Broadcast Signals* 97 (1997). In 2000, the Register of Copyrights (the "Register") asserted that "the section 111 license does not and should not apply to Internet retransmissions." *Copyright Broadcast Programming on the Internet: Hearing Before the Subcomm. on Courts and Intellectual Property of the Comm. on the Judiciary*, 106th Cong. 25-26 (2000) (statement of Marybeth Peters, The

-22-

Register of Copyrights) (quoting *Letter of Marybeth Peters, Register of Copyrights, to the Honorable Howard Coble* (Nov. 10, 1999)).  The Register further concluded that "if there were to be a compulsory license covering such retransmissions, it would have to come from newly-enacted legislation and not existing law."  *Id.*

In 2008, the Copyright Office stated:

> The Office continues to oppose an Internet statutory license that would permit any website on the Internet to retransmit television programming without the consent of the copyright owner.  Such a measure, if enacted, would effectively wrest control away from program producers who make significant investments in content and who power the creative engine in the U.S. economy.  In addition, a government-mandated Internet license would likely undercut private negotiations leaving content owners with relatively little bargaining power in the distribution of broadcast programming.

SHVERA Report at 188.  It continued to hold this position in 2011.  *See* U.S. Copyright Office, *Satellite Television Extension and Localism Act § 302 Report* 48 (Aug. 29, 2011); 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.18[E][1] n.129.25 (Matthew Bender rev. ed. 2012) (1963).

-23-

More broadly, the Copyright Office has maintained that § 111's compulsory license for cable systems is intended for localized retransmission services; under this interpretation, Internet retransmission services are not entitled to a § 111 license. *See* 57 Fed. Reg. 3284 (Jan. 29, 1992) (codified at 37 C.F.R. § 201.17); *see also Oman*, 17 F.3d at 346. With respect to satellite carriers, the Copyright Office has stated: "Examination of the overall operation of section 111 proves that the compulsory license applies only to localized retransmission services regulated as cable systems by the FCC." 57 Fed. Reg. 3284, 3292 (Jan. 29, 1992); *see also* 62 Fed. Reg. 187-05, 18707 (Apr. 17, 1997) ("[T]he Office retains the position that a provider of broadcast signals be an inherently localized transmission media of limited availability to qualify as a cable system." (citing 56 Fed. Reg. 31595 (July 11, 1991)).

To reach this conclusion, the Copyright Office has explained that § 111(f) refers to "headends" and "contiguous communities," which are inapplicable to nationwide retransmission service. 57 Fed. Reg. 3284, 3290. The

Copyright Office also noted that § 111 defines a "'distant signal equivalent' with reference to television stations 'within whose local service area the cable system is located.'" *Id.*[9] Because satellite carriers provide nationwide retransmission service and because they are not located in their local service area, the Copyright Office concluded that satellite carriers were not cable systems under § 111. *Id.* Under this interpretation, Internet retransmission services cannot constitute cable systems under § 111 because they provide nationwide -- and arguably global -- services.

Finally, the Copyright Office has consistently recognized that § 111's reference to "other communications channels" should not be read broadly to include "future unknown services," such as satellite, multipoint distribution ("MMDS"), and satellite master antenna television ("SMATV") transmissions. *Id.* at 3293-96 & n.5.

---

[9] A "'distant signal equivalent' is a figure used to calculate the percentage of gross receipts owed by a cable system to the copyright holders of programs broadcast." *Oman*, 17 F.3d at 347 n.6 (citing sources).

In 1992, in response to whether "future unknown services" could qualify for compulsory licenses, the Copyright Office concluded that because "the 1976 Act did not consider the public policy implications of extending a compulsory license to these non-cable services, the Copyright Office should not assert the authority to interpret the Copyright act in this way. *Id.* at 3293, n.5.

In light of the Copyright Office's expertise, the validity of its reasoning, the consistency of its earlier and later pronouncements, and the consistency of its opinions with Congress's purpose in enacting § 111, we conclude that the Copyright Office's position is reasonable and persuasive. *See Mead*, 533 U.S. at 227-28.

Accordingly, applying *Chevron*, we hold that: (1) the statutory text is ambiguous as to whether ivi, a service that retransmits television programming over the Internet, is entitled to a compulsory license under § 111; (2) the statute's legislative history, development, and purpose indicate that Congress did not intend for § 111 licenses to extend to Internet retransmissions; (3) the

Copyright Office's interpretation of § 111 -- that Internet retransmission services do not constitute cable systems under § 111 -- aligns with Congress's intent and is reasonable; and (4) accordingly, the district court did not abuse its discretion in finding that plaintiffs were likely to succeed on the merits of the case.

## II.  *Irreparable Injury*

We next turn to whether the district court abused its discretion in finding that plaintiffs would suffer irreparable harm in the absence of a preliminary injunction -- that is, harm to the plaintiff's legal interests that could not be remedied after a final adjudication.  *See Kickham*, 558 F.3d at 209 (abuse of discretion); *Salinger*, 607 F.3d at 82 (irreparable harm).  Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss. *Salinger*, 607 F.3d at 81.  Under *Salinger*, courts may no longer simply presume irreparable harm; rather, plaintiffs must demonstrate that, on the facts of the case, the failure to issue an injunction would actually cause irreparable

harm. *Id.* at 82 (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006)). Courts must pay "particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for [the] injury.'" *Id.* at 80 (quoting *eBay*, 547 U.S. at 391).

We hold that the district court did not abuse its discretion in finding that plaintiffs would suffer irreparable harm without a preliminary injunction. First, ivi's live retransmissions of plaintiffs' copyrighted programming over the Internet would substantially diminish the value of the programming. Second, plaintiffs' losses would be difficult to measure and monetary damages would be insufficient to remedy the harms. Third, ivi would be unable to pay damages should plaintiffs prevail.

First, ivi's actions harm plaintiffs' retransmission and advertising revenues by substantially diminishing the value of their copyrighted programming. Retransmission consent is a substantial and growing revenue source for the television programming industry. Plaintiffs obtain retransmission revenue by licensing the right to

retransmit their copyrighted television programming to cable, satellite, and telecommunications providers. *See ivi*, 765 F. Supp. 2d at 618-19. Plaintiffs broadcast their copyrighted programming to various communities at different scheduled times, for example, based on time zone or local network provider. For this reason, negotiated Internet retransmissions -- for example, on Hulu.com -- typically delay Internet broadcasts as not to disrupt plaintiffs' broadcast distribution models, reduce the live broadcast audience, or divert the live broadcast audience to the Internet.

If ivi were allowed to continue retransmitting plaintiffs' programming live, nationally (and arguably, internationally), over the Internet, and without plaintiffs' consent, ivi could make plaintiffs' programming available earlier in certain time zones than scheduled by the programs' copyright holders or paying retransmission rights holders. ivi's retransmissions of plaintiffs' copyrighted programming without their consent thus would devalue the programming by reducing its "live" value and undermining

existing and prospective retransmission fees, negotiations, and agreements. ivi's retransmissions would dilute plaintiffs' programming and their control over their product.

The value of plaintiffs' programming would also be harmed by the impact on advertising revenue. Broadcast television stations and networks earn most of their revenues from advertising. Plaintiffs argue -- persuasively -- that advertisers pay substantial fees to target specific audiences; such fees are often determined by the number of viewers and their demographic profiles. ivi's retransmissions of plaintiffs' copyrighted programming over the Internet increases the number of Internet viewers and reduces, "fragments," and diverts the number of "local viewers." *See* Lisa Lapan, *Network Television and the Digital Threat*, 16 UCLA Ent. L. Rev. 343, 354, 357, 385 (2009); *see also* Michelle R. Hull, *Sports Leagues' New Social Media Policies: Enforcement Under Copyright Law and State Law*, 34 Colum. J.L. & Arts 457, 487-88 (2011). As a result, ivi's retransmissions weaken plaintiffs' negotiating

position with advertisers and reduce the value of its local advertisements. *See e.g.*, *MPAA*, 836 F.2d at 603 ("Local advertisers will not pay extra to reach viewers who cannot reasonably be expected to patronize their businesses, so the revenue base from which to compensate the owners understates the value of the use of the materials, and the copyright holders would . . . be undercompensated." (citing sources)).

Indeed, ivi's actions -- streaming copyrighted works without permission -- would drastically change the industry, to plaintiffs' detriment. *See e.g.*, Adam B. Vanwagner, *Seeking a Clearer Picture: Assessing the Appropriate Regulatory Framework for Broadband Video Distribution*, 79 Fordham L. Rev. 2909, 2912 (2011); Lisa Lapan, *supra*, at 344-45, 350-58; Howard M. Frumes, Susan Cleary, and Lorin Brennan, *Developing an Internet and Wireless License Agreement for Motion Pictures and Television Programming*, 1 J. Int'l Media & Ent. L. 283, 284-85 (2007). The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi's

lead in retransmitting plaintiffs' copyrighted programming without their consent.  The strength of plaintiffs' negotiating platform and business model would decline.  The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules -- all would be adversely affected.  These harms would extend to other copyright holders of television programming.  Continued live retransmissions of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.

Second, plaintiffs' losses would be difficult to measure and monetary damages would be insufficient to remedy the harms.  *See eBay*, 547 U.S. at 391; *Salinger*, 607 F.3d at 80; *Tom Doherty Assoc., Inc. v. Sabin Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (holding injunctive relief appropriate "to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that [the quantification of] damages must be based

-32-

on more than speculation."). In this case, there is no assurance that damages could be reasonably calculated at trial. Indeed, even ivi "appreciates that the magnitude of the harm . . . may be difficult or impossible to quantify." Br. of Defs.-Appellants at 36. Additionally, because the harms affect the operation and stability of the entire industry, monetary damages could not adequately remedy plaintiffs' injuries.

Third, as defendants have acknowledged, ivi would be unable to pay any substantial damages award should plaintiffs prevail. *See* Br. of Defs.-Appellants at 38 ("[T]he injunction has effectively shut down the majority of ivi's business, foreclosing any meaningful ability to generate any revenue during the pendency of the litigation."). The "unlikelihood that defendant[s] . . . would, in any event, be able to satisfy a substantial damage award" further supports a finding of irreparable harm. *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).

Accordingly, we conclude that the district court did not abuse its discretion in finding that plaintiffs would suffer irreparable harm without a preliminary injunction.

## III. *Balance of Hardships*

We next turn to whether the district court abused its discretion in finding that the balance of hardships weighed in favor of granting a preliminary injunction. *See Kickham*, 558 F.3d at 209 (abuse of discretion); *Salinger*, 607 F.3d at 82 (balance of hardships).

We conclude that it did not, for plaintiffs demonstrated that the balance of hardships weighed heavily in favor of granting a preliminary injunction. As discussed above, plaintiffs established both a likelihood of success on the merits and irreparable harm -- the absence of an injunction would result in the continued infringement of their property interests in the copyrighted material. As for defendants, as the district court noted, "[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product."

*ivi*, 765 F. Supp. 2d at 621 (citing sources).  ivi cannot be "legally harmed by the fact that it cannot continue streaming plaintiffs' programming, even if this ultimately puts ivi out of business."  *Id.*  The balance of hardships, therefore, clearly tips in plaintiffs' favor.

**IV.  _Public Interest_**

Finally, we assess whether the district court abused its discretion in finding that the public interest would not be disserved by the grant of a preliminary injunction.  *See Kickham*, 558 F.3d at 209 (abuse of discretion); *see also eBay*, 547 U.S. at 391 (public interest); *Salinger*, 607 F.3d at 82-83 (same).

Copyright law inherently balances the two competing public interests presented in this case:  the rights of users and the public interest in the broad accessibility of creative works, and the rights of copyright owners and the public interest in rewarding and incentivizing creative efforts (the "owner-user balance").  *See Crisp*, 467 U.S. at 710.

Here, streaming television programming live and over the Internet would allow the public -- or some portions of the public -- to more conveniently access television programming. *See* Lisa Lapan, *supra*, at 361 (discussing choice and convenience in "TV/Internet" convergence); *see* Tim Wu, *Intellectual Property, Innovation, and Decentralized Decisions*, 92 Va. L. Rev. 123, 139 (2006) (discussing balancing of interests and noting historic problem where "holders of copyright block or slow the dissemination of technologies of potentially broad social value that threaten an existing market position").

On the other hand, the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012) (citing *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985)). Inadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of

creative work thus ultimately serves the public's interest in promoting the accessibility of such works. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 961 (2005) (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)).

Plaintiffs are copyright owners of some of the world's most recognized and valuable television programming. Plaintiffs' television programming provides a valuable service to the public, including, *inter alia*, educational, historic, and cultural programming, entertainment, an important source of local news critical for an informed electorate, and exposure to the arts. *See Turner*, 512 U.S. at 648. Plaintiffs' desire to create original television programming surely would be dampened if their creative works could be copied and streamed over the Internet in derogation of their exclusive property rights.

Further, there is a delicate distinction between enabling broad public access and enabling ease of access to copyrighted works. The service provided by ivi is targeted more toward convenience than access, and the public will

still be able to access plaintiffs' programs through means other than ivi's Internet service, including cable television. Preliminarily enjoining defendants' streaming of plaintiffs' television programming over the Internet, live, for profit, and without plaintiffs' consent does not inhibit the public's ability to access the programs. A preliminary injunction, moreover, does not affect services that have obtained plaintiffs' consent to retransmit their copyrighted television programming over the Internet.

Accordingly, we conclude the district court did not abuse its discretion in finding that a preliminary injunction would not disserve the public interest.

## *CONCLUSION*

We have considered defendants' remaining arguments and conclude that they are without merit. For the reasons set forth above, we hold that the district court did not abuse its discretion in granting a preliminary injunction to plaintiffs, and the judgment of the district court is AFFIRMED.