CHIN, Circuit Judge:
I respectfully dissent.
Defendant-appellee Aereo, Inc. (“Aer-eo”) captures over-the-air broadcasts of television programs and retransmits them to subscribers by streaming them over the Internet. For a monthly fee, Aereo’s customers may ‘Watch” the programming “live” (that is, with a seven-second delay) on their computers and other electronic devices, or they may “Record” the programs for later viewing. Aereo retransmits the programming without the authorization of the copyright holders and without paying a fee.
The Copyright Act confers upon owners of copyrights in audiovisual works the exclusive right “to perform the copyrighted work publicly.” 17 U.S.C. § 106(4). This exclusive right includes the right “to transmit or otherwise communicate a performance ... to the public, by means of any device or process.” Id. § 101. In my view, by transmitting (or retransmitting) copyrighted programming to the public without authorization, Aereo is engaging in copyright infringement in clear violation of the Copyright Act.
Aereo argues that it is not violating the law because its transmissions are not “public” performances; instead, the argument goes, its transmissions are “private” performances, and a “private performance is not copyright infringement.” It contends that it is merely providing a “technology platform that enables consumers to *697 use remotely-located equipment ... to create, access and view their own unique recorded copies of free over-the-air broadcast television programming.”
Aereo’s “technology platform” is, however, a sham. The system employs thousands of individual dime-sized antennas, but there is no technologically sound reason to use a multitude of tiny individual antennas rather than one central antenna; indeed, the system is a Rube Goldberg-like contrivance, over-engineered in an attempt to avoid the reach of the Copyright Act and to take advantage of a perceived loophole in the law. After capturing the broadcast signal, Aereo makes a copy of the selected program for each viewer, whether the user chooses to “Watch” now or “Record” for later. Under Aereo’s theory, by using these individual antennas and copies, it may retransmit, for example, the Super Bowl “live” to 50,000 subscribers and yet, because each subscriber has an individual antenna and a “unique recorded cop[y]” of the broadcast, these are “private” performances. Of course, the argument makes no sense. These are very much public performances.
Aereo purports to draw its infringement-avoidance scheme from this Court’s decision in Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121 (2d Cir.2008), cert. denied, — U.S. -, 129 S.Ct. 2890, 174 L.Ed.2d 595 (2009) (“Cablevision”). But, as discussed below, there are critical differences between Cablevision and this case. Most significantly, Cablevision involved a cable company that paid statutory licensing and retransmission consent fees for the content it retransmitted, while Aer-eo pays no such fees. Moreover, the subscribers in Cablevision already had the ability to view television programs in real-time through their authorized cable subscriptions, and the remote digital video recording service at issue there was a supplemental service that allowed subscribers to store that authorized content for later viewing. In contrast, no part of Aereo’s system is authorized. Instead, its storage and time-shifting functions are an integral part of an unlicensed retransmission service that captures broadcast television programs and streams them over the Internet.
Aereo is doing precisely what cable companies, satellite television companies, and authorized Internet streaming companies do — they capture over-the-air broadcasts and retransmit them to customers — except that those entities are doing it legally, pursuant to statutory or negotiated licenses, for a fee. By accepting Aereo’s argument that it may do so without authorization and without paying a fee, the majority elevates form over substance. Its decision, in my view, conflicts with the text of the Copyright Act, its legislative history, and our case law.
For these and other reasons discussed more fully below, I would reverse the district court’s order denying plaintiffs-appellants’ motion for a preliminary injunction.

DISCUSSION

When interpreting a statute, we must begin with the plain language, giving any undefined terms their ordinary meaning. See Roberts v. Sea-Land Servs., Inc., — U.S. -, 132 S.Ct. 1350, 1356, 182 L.Ed.2d 341 (2012); United States v. Desposito, 704 F.3d 221, 226 (2d Cir.2013). We must “attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole.” Pettus v. Morgenthau, 554 F.3d 293, 297 (2d Cir.2009). Where Congress has expressed its intent in “reasonably plain terms, that language must ordinarily be regarded as conclusive.” Negonsott v. Samuels, 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (internal quotation marks and cita *698 tion omitted); see Devine v. United States, 202 F.3d 547, 551 (2d Cir.2000). If we conclude that the text is ambiguous, however, we will look to legislative history and other tools of statutory interpretation to “dispel this ambiguity.” In re Air Cargo Shipping Servs. Antitrust Litig., 697 F.3d 154, 159 (2d Cir.2012).
I begin, then, by considering the text of the relevant sections of the Copyright Act. To the extent there is any arguable ambiguity in the statutory language, I next turn to its legislative history. Finally, I conclude with a discussion of Cablevision as well as other relevant precedents.
A. The Statutory Text
Section 106 of the Copyright Act sets out six exclusive rights held by a copyright owner; these include the right “to perform the copyrighted work publicly.” 17 U.S.C. § 106(4).
As defined in section 101, “[t]o perform ... a work ‘publicly’ means,” among other things:
to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.
Id. § 101. “To ‘transmit’ a performance” is “to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.” Id. Hence, the use of a device or process to transmit or communicate copyrighted images or sounds to the public constitutes a public performance, whether members of the public receive the performance in the same place or in different places, whether at the same time or at different times.
It is apparent that Aereo’s system fits squarely within the plain meaning of the statute. See, e.g., Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC, No. CV 12-6921, — F.Supp.2d -, ---, 2012 WL 6784498, at *1-6 (C.D.Cal. Dec. 27, 2012) (holding that a service “technologically analogous” to Aer-eo’s was engaged in public performances). The statute is broadly worded, as it refers to “any device or process.” 17 U.S.C. § 101 (emphasis added); see also id. (defining “device” and “process” as “one now known or later developed”). Aereo’s system of thousands of antennas and other equipment clearly is a “device or process.” Using that “device or process,” Aereo receives copyrighted images and sounds and “transmit[s] or otherwise communicate[s]” them to its subscribers “beyond the place from which they are sent,” id., that is, “ ‘beyond the place’ of origination,” Columbia Pictures Indus., Inc. v. Profl Real Estate Investors, Inc., 866 F.2d 278, 282 (9th Cir.1989). The “performance or display of the work” is then received by paying subscribers “in separate places” and “at different times.” 17 U.S.C. § 101.
Even assuming Aereo’s system limits the potential audience for each transmission, and even assuming each of its subscribers receives a unique recorded copy, Aereo still is transmitting the programming “to the public.” Id. Giving the undefined term “the public” its ordinary meaning, see Kouichi Taniguchi v. Kan Pacific Saipan, Ltd., — U.S. -, 132 S.Ct. 1997, 2002, 182 L.Ed.2d 903 (2012), a transmission to anyone other than oneself or an intimate relation is a communication to a “member! ] of the public,” because it is not in any sense “private.” See Webster’s II: New Riverside University Dictionary 951 (1994) (defining “public” as “[t]he community or the people as a group”); see also id. at 936 (defining “private” as, inter alia, “[n]ot public: inti *699 mate”). Cf. Cablevision, 536 F.3d at 138 (“[T]he identity of the transmitter ... [is] germane in determining whether that transmission is made ‘to the public.’ ”); Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 299-300 (3d Cir.1991) (construing “to the public” in section 106(3) and concluding that “even one person can be the public”).
What Aereo is doing is not in any sense “private,” as the Super Bowl example discussed above illustrates. This understanding accords with the statute’s instruction that a transmission can be “to the public” even if the “members of the public capable of receiving the performance, receive it in the same place or in separate places and at the same time or at different times.” 17 U.S.C. § 101. Because Aereo is transmitting television signals to paying strangers, all of its transmissions are “to the public,” even if intervening “devicefs] or processes]” limit the potential audience of each separate transmission to a single “member[ ] of the public.” Id.
By any reasonable construction of the statute, Aereo is engaging in public performances and, therefore, it is engaging in copyright infringement. See id. §§ 106(4), 501(a).
B. The Legislative History
Even if the language of the transmit clause were ambiguous as applied to Aer-eo’s system, see Cablevision, 536 F.3d at 136 (“[T]he transmit clause is not a model of clarity .... ”), the legislative history reinforces the conclusion that Aereo is engaging in public performances. The legislative history makes clear that Congress intended to reach new technologies, like this one, that are designed solely to exploit someone else’s copyrighted work.
Just before the passage of the 1976 Copyright Act, the Supreme Court held in Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and Teleprompter Corp. v. Columbia Broadcasting System, Inc., 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), that community antenna television (“CATV”) systems — which captured live television broadcasts with antennas set on hills and retransmitted the signals to viewers unable to receive the original signals — did not infringe the public performance right because they were not “performing” the copyrighted work. See Teleprompter, 415 U.S. at 408-09, 94 S.Ct. 1129; Fortnightly, 392 U.S. at 399-400, 88 S.Ct. 2084. In reaching this conclusion, the Court reasoned that:
If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be ‘performing’ the programs he received on his television set.... The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.
Fortnightly, 392 U.S. at 400, 88 S.Ct. 2084. This rationale is nearly identical to the justification advanced by Aereo: each subscriber could legally use his own antenna, digital video recorder (“DVR”), and Sling-box [1] to stream live television to his com *700 puter or other device, and so it makes no legal difference that the system is actually “erected and owned not by its users but by an entrepreneur.” IdL[2]
But Congress expressly rejected the outcome reached by the Supreme Court in Fortnightly and Teleprompter. See Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 709, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (“Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement.”); see also WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 281 (2d Cir.2012); Fox Television Stations, — F.Supp.2d at -, 2012 WL 6784498, at *5. In the 1976 Copyright Act, Congress altered the definitions of “perform” and “publicly” specifically to render the CATV systems’ unlicensed retransmissions illegal. See Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 469 n. 17, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); H.R.Rep. No. 94-1476, at 63, reprinted in 1976 U.S.C.C.A.N. 5659, 5676-77 (“[A] cable television system is performing when it retransmits the broadcast to its subscribers ....”); id. at 64, reprinted in 1976 U.S.C.C.A.N. at 5678 (“Clause (2) of the definition of ‘publicly’ in section 101 makes clear that the concept[] of public performance ... inelude[s] ... acts that transmit or otherwise communicate a performance or display of the work to the public....”).
Congress was not only concerned, however, with the then newly-emerging CATV systems. Recognizing that the Fortnightly and Teleprompter decisions arose in part because of the “drastic technological change” after the 1909 Act, Fortnightly, 392 U.S. at 396, 88 S.Ct. 2084, Congress broadly defined the term “transmit” to ensure that the 1976 Act anticipated future technological developments:
The definition of ‘transmit’ ... is broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a ‘transmission,’ and if the transmission reaches the public in [any] form, the case comes within the scope of clauses (4) or (5) of section 106.
H.R.Rep. No. 94-1476, at 64, reprinted in 1976 U.S.C.C.A.N. at 5678. Further anticipating that there would be changes in technology that it could not then foresee, Congress added that a public performance could be received in different places and at different times. This change was meant to clarify that:
a performance made available by transmission to the public at large is ‘public’ even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service.
Id. at 64-65, reprinted at 1976 U.S.C.C.A.N. at 5678 (emphasis added).
*701 While Congress in 1976 might not have envisioned the precise technological innovations employed by Aereo today, this legislative history surely suggests that Congress could not have intended for such a system to fall outside the definition of a public performance. To the contrary, Congress made clear its intent to include within the transmit clause “all conceivable forms and combinations of wires and wireless communications media,” and if, as here, “the transmission reaches the public in [any] form, the case comes within the scope of clauses (4) or (5) of section 106.” H.R.Rep. No. 94-1476, at 64, reprinted in 1976 U.S.C.C.A.N. at 5678. Aereo’s streaming of television programming over the Internet is a public performance as Congress intended that concept to be defined.
C. Cablevision
Aereo seeks to avoid the plain language of the Copyright Act and the clear import of its legislative history by relying on this Court’s decision in Cablevision. That reliance, in my view, is misplaced.
Cablevision was a cable operator with a license to retransmit broadcast and cable programming to its paying subscribers. See Cablevision, 536 F.3d at 123-25; Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp., 478 F.Supp.2d 607, 610 (S.D.N.Y.2007), rev’d sub nom., Cartoon Network LP v. CSC Holdings, Inc. (Cablevision), 536 F.3d 121 (2d Cir.2008). The content providers sought to enjoin Cablevision from introducing a new Remote Storage DVR system (the “RS-DVR”) that would “allow[] Cablevision customers who do not have a stand-alone DVR to record cable programming” and “then receive playback of those programs through their home television sets.” Cablevision, 536 F.3d at 124. The lawsuit challenged only whether Cablevision needed additional licenses to allow its subscribers to record shows and play them back later through the RS-DVR system. See Twentieth Century Fox, 478 F.Supp.2d at 609. If subscribers wanted to watch “live” television, they would watch it through Cablevision’s licensed retransmission feed. See Cablevision, 536 F.3d at 124 (explaining that Cablevision split its programming data stream, sending one “immediately to customers as before”); Amicus Br. of Cablevision Sys. Corp. at 20.
The RS-DVR worked as follows. Ca-blevision split its licensed data stream, and sent a stream to a remote server, where the data went through two buffers. Cablevision, 536 F.3d at 124. At the first buffer, the system made a temporary copy of 0.1 seconds of programming while it inquired whether any subscribers wanted to copy that programming. Id. A customer could make such a request “by selecting a program in advance from an on-screen guide, or by pressing the record button while viewing a given program.” Id. at 125. If a request had been made, the data moved to the second buffer and then was permanently saved onto a portion of a hard drive designated for that customer. Id. at 124. At the customer’s request, the permanent copy was transmitted to the customer and played back to him. Id. at 125.
Cablevision held that the RS-DVR did not infringe either the reproduction or the public performance rights. Id. at 140. Unlike the majority here, I do not think we can view Cablevision’s analyses of each right in isolation. See Majority Opin., supra, at 687. As Cablevision explained, “the right of reproduction can reinforce and protect the right of public performance.” Cablevision, 536 F.3d at 138. “Given this interplay between the various rights in this context,” id., Cablevision’s holding that “copies produced by the RS- *702 DVR system are ‘made’ by the RS-DVR customer,” id. at 133, was critical to its holding that “each RS-DVR playback transmission ... made to a single subscriber using a single unique copy produced by that subscriber ... [is] not [a] performance[ ] ‘to the public,’ ” id. at 139 (emphasis added); see also Amicus Br. of the United States at 17-19, Cable News Network, Inc. v. CSC Holdings, Inc., 129 S.Ct. 2890 (2009), denying cert., Cartoon Network LP v. CSC Holdings, Inc. (Cablevision), 536 F.3d 121 (2d Cir.2008) [hereinafter “U.S. Cablevision Amicus Br.”].
With this concept in mind, it is clear that Aereo’s system is factually distinct from Cablevision’s RS-DVR system. First, Ca-blevision’s RS-DVR system “exist[ed] only to produce a copy” of material that it already had a license to retransmit to its subscribers, Cablevision, 536 F.3d at 131, but the Aereo system produces copies to enable it to transmit material to its subscribers. Whereas Cablevision promoted its RS-DVR as a mechanism for recording and playing back programs, Aereo promotes its service as a means for watching “live” broadcast television on the Internet and through mobile devices. Unlike Ca-blevision, however, Aereo has no licenses to retransmit broadcast television. If a Cablevision subscriber wanted to use her own DVR to record programming provided by Cablevision, she could do so through Cablevision’s licensed transmission. But an Aereo subscriber could not use her own DVR to lawfully record content received from Aereo because Aereo has no license to retransmit programming; at best, Aer-eo could only illegally retransmit public broadcasts from its remote antennas to the user. See, e.g., Fortnightly Corp., 392 U.S. at 400, 88 S.Ct. 2084, overruled by statute as recognized in, Capital Cities Cable, 467 U.S. at 709, 104 S.Ct. 2694; ivi, Inc., 691 F.3d at 278-79; see also U.S. Cablevision Amicus Br., supra, at 21 (arguing that the legality of a hypothetical unlicensed system that only allowed subscribers to copy and playback content “would be suspect at best, because [the subscriber] would be ... copying programs that he was not otherwise entitled to view”). Aereo’s use of copies is essential to its ability to retransmit broadcast television signals, while Cablevision’s copies were merely an optional alternative to a set-top DVR. The core of Aereo’s business is streaming broadcasts over the Internet in real-time; the addition of the record function, however, cannot legitimize the unauthorized retransmission of copyrighted content.
Second, subscribers interact with Aer-eo’s system differently from the way Ca-blevision’s subscribers interacted with the RS-DVR. Cablevision subscribers were already paying for the right to watch television programs, and the RS-DVR gave them the additional option to “record” the programs. Cablevision, 536 F.3d at 125. In contrast, Aereo subscribers can choose either “Watch” or “Record.” Am. Broad. Cos. v. AEREO, Inc., 874 F.Supp.2d 373, 377 (S.D.N.Y.2012). Both options initiate the same process: a miniature antenna allocated to that user tunes to the channel; the television signal is transmitted to a hard drive; and a full-length, permanent copy is saved for that customer. Id. at 377-79. If the subscriber has opted to “Watch” the program live, the system immediately begins playing back the user’s copy at the same time it is being recorded. Id. Aereo will then automatically delete the saved copy once the user is done watching the program, unless the subscriber chooses to save it. Id. at 379.
These differences undermine the applicability of Cablevision to Aereo’s system. Cablevision found that the RS-DVR was indistinguishable from a VCR or set-top DVR because Cablevision’s system “ex *703 ist[ed] only to produce a copy” and its subscribers provided the “volitional conduct” necessary to make a copy by “ordering that system to produce a copy of a specific program.” Cablevision, 536 F.3d at 131; see also U.S. Cablevision Amicus Br., supra, at 16 (noting that Cablevision turned on whether RS-DVR was more analogous to set-top DVR or video-on-demand service). The RS-DVR was not designed to be a substitute for viewing live television broadcasts. Aereo’s system, however, was designed to be precisely that. It does not exist only, or even primarily, to make copies; it exists to stream live television through the Internet. Its users can choose to “Watch” live television instead of “Record” a program, but the system begins to produce a full-length copy anyway because, even under its own theory, Aereo cannot legally retransmit a television signal to them without such a copy.[3] Aereo’s system is much different than a VCR or DVR — indeed, as Aereo explains, it is an antenna, a DVR, and a Slingbox rolled into one — and for that reason Cablevision does not control our decision here.
I note also that in Cablevision this Court “emphasize[d]” that its holding “does not generally permit content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies.” 536 F.3d at 139. Likewise, when 'the United States opposed the grant of certiorari in Cablevision, it argued that “the Second Circuit’s analysis of the public-performance issue should not be understood to reach ... other circumstances beyond those presented.” U.S. Cablevision Amicus Br., supra, at 21.[4] Cablevision should not be extended to cover the circumstances presented in this case. Indeed, it is telling that Aereo declines to offer its subscribers channels broadcast from New Jersey, even though its antennas are capable of receiving those signals, for fear of being subject to suit outside the Second Circuit, ie., outside the reach of Cablevision. Cf. Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC, No. CV 12-6921, — F.Supp.2d -,-, 2012 WL 6784498, at *3-4 (C.D.Cal. Dec. 27, 2012) (declining to follow Cablevision and enjoining an Aereo-like system based on plain meaning of § 101).
Finally, the majority’s decision in my view runs afoul of other decisions of this *704 Court. Although the issue was not even contested, in ivi we recognized that the retransmission of copyrighted television programming by streaming it live over the Internet constituted a “public performance” in violation of the Copyright Act. 691 F.3d at 278, 286, 287.[5] Similarly, in United States v. American Society of Composers, Authors, Publishers (“ASCAP”), where, again, the issue was not even contested, we observed that the streaming of a song, like the streaming of a “television or radio broadcast,” is a public performance. 627 F.3d 64, 74 (2d Cir.2010) (but holding in contrast that downloads of music do not constitute “public performances”); [6] accord Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 106-07, 111-12 (2d Cir.1998) (holding that device allowing users to access private phone line to listen to public radio broadcasts infringed right of public performance, in the absence of a defense, and was not fair use).
In ivi, we addressed the need for a preliminary injunction to enjoin ivi from streaming copyrighted works over the Internet without permission:
Indeed, ivi’s actions — streaming copyrighted works without permission— would drastically change the industry, to plaintiffs’ detriment.... The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi’s lead in retransmitting plaintiffs’ copyrighted programming without their consent. The strength of plaintiffs’ negotiating platform and business model would decline. The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules — all would be adversely affected. These harms would extend to other copyright holders of television programming. Continued live retransmissions of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.
691 F.3d at 286. These concerns apply with equal force here, where Aereo is doing precisely what ivi was enjoined from *705 doing: streaming copyrighted works over the Internet without permission of the copyright holders. Today’s decision does not merely deny the broadcasters a licensing fee for Aereo’s activity; it provides a blueprint for others to avoid the Copyright Act’s licensing regime altogether. See Appellant ABC, Inc. Br. at 10 (citing articles reporting on the rise of copycat services). Congress could not have intended such a result.

CONCLUSION

Based on the plain meaning of the statute, its legislative history, and our precedent, I conclude that Aereo’s transmission of live public broadcasts over the Internet to paying subscribers are unlicensed transmissions “to the public.” Hence, these unlicensed transmissions should be enjoined. Cablevision does not require a different result. Accordingly, I dissent.

. A "Slingbox” is a set-top box that permits consumers to shift their television programming to their portable devices. Slingbox describes its service as “placeshifting”: "Placeshifting is viewing and listening to live, recorded or stored media on a remote device over the Internet or a data network. Placeshifting allows consumers to watch their TV anywhere.” See Placeshifting, Slingbox.com, http://www.slingbox.com/gef/ placeshifting (last visited March 5, 2013). The Slingbox thus enables a consumer to view on a remote device content that he is already entitled to receive from a licensed cable company or other authorized source to view on his television.

. Aereo’s contention that each subscriber has an individual antenna is a fiction because the vast majority of its subscribers are "dynamic users” who are randomly assigned an antenna each time they use the system. Although each antenna is used only by one person at a time, it will be randomly assigned to another person for the next use. In other words, this is a shared pool of antennas, not individually-designated antennas.

. Aereo’s web page does contain a conspicuous notice under the "Watch” button that reads, "When you press ‘Watch’ you will start recording this show.” Users thus have no choice but to record the show if they wish to watch it live, making it unlikely that the subscribers are voluntarily “ordering that system to produce a copy.” Cablevision, 536 F.3d at 131.

. By opposing the grant of certiorari, the government was not embracing Cablevision's construction of the transmit clause. To the contrary, the United States took the position that "scattered language in the Second Circuit's decision could be read to endorse overly broad, and incorrect, propositions about the Copyright Act.” U.S. Cablevision Amicus Br., supra, at 6 (emphasis added). Specifically, the government was concerned with the suggestion "that a performance is not made available ‘to the public’ unless more than one person is capable of receiving a particular transmission” because it might “undermine copyright protection in circumstances far beyond those presented here, including with respect to ... situations in which a party streams copyrighted material on an individualized basis over the Internet.” Id. at 20-21. Despite these "problematic” aspects, id. at 22, the United States considered Cablevision an "unsuitable vehicle” for deciding these issues, due to the absence of any conflicting circuit court decisions at the time and the limitations imposed by the parties’ stipulations, id. at 6.

. There are companies in the market that stream television programming over the Internet pursuant to licenses, such as Hulu, Netflix, Amazon, and channel-specific websites like ComedyCentral.com. See Appellant WNET Br. at 12, 28, 43; Amicus Br. of Paramount Pictures Corp. et al. at 29. In general, however, these “negotiated Internet retransmissions ... typically delay Internet broadcasts as not to disrupt plaintiffs’ broadcast distribution models, reduce the live broadcast audience, or divert the live broadcast audience to the Internet.” WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 285 (2d Cir.2012).

. In ASCAP, we left open “the possibility ... that a transmission could constitute both a stream and a download.” United States v. Am. Soc’y of Composers, Authors and Publishers (ASCAP), 627 F.3d 64, 74 n. 10 (2d Cir.2010). While streaming performances over the Internet constitutes a transmission "to the public,” see ivi, Inc., 691 F.3d at 278-79; ASCAP, 627 F.3d at 74, allowing a consumer to download a copy so he can later play it back for himself does not, see ASCAP, 627 F.3d at 73, 75; Cablevision, 536 F.3d at 139. To the extent that Aereo's system immediately plays back from a copy that is still being recorded, it is clearly "both a stream and a download,” ASCAP, 627 F.3d at 74 n. 10, and at a minimum the streaming portion constitutes an unlicensed public performance. If 50,000 Aereo subscribers choose to "Watch” the Super Bowl live, each subscriber receives a "performance or display” of the exact same broadcast on a seven-second delay, even if Aereo is also simultaneously creating a unique copy for each subscriber so that each one has the option to pause, rewind, or save the copy for later if they wish. Until the subscriber exercises that option, the existence of the copy is irrelevant; the broadcast is streaming "live” to each user at the same time just as it did in ivi.