20-3816
ABKCO Music, Inc. v. Sagan

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2021

(Argued: March 14, 2022                    Decided:      October 6, 2022)

Docket Nos. 20-3816(L), 20-4020(CON), 20-4099(XAP)
_____

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI
APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC
PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC.,
DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG
INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREENGEMS-EMI
MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC
LLC, PEER INTERNATIONAL CORP., PSO LTD., PEERMUSIC LTD., PEERMUSIC III, LTD.,
SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L, SPIRIT TWO MUSIC, INC.,
WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,

Plaintiffs-Counter-Defendants-Appellees-Cross-
Appellants,

v.

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC,
DBA WOLFGANG'S VAULT, DBA CONCERT VAULT, DBA MUSIC VAULT, DBA
DAYTROTTER,

Defendants-Counterclaimants-Appellants-Cross-
Appellees.

_____

Before: JACOBS, WESLEY, and MENASHI, Circuit Judges.

A collection of music publishers alleged infringement of their copyrights in 197 musical works when a series of live concert recordings was made available by the defendants for download and streaming on their websites. Plaintiffs sought damages and a permanent injunction pursuant to the Copyright Act. The United States District Court for the Southern District of New York (Ramos, J.) held on summary judgment that defendants had no valid licenses and therefore infringed each of the musical works, and that the principal was personally liable. The district court denied plaintiffs' request for a permanent injunction. Two years later, after a nine-day damages trial, the jury awarded plaintiffs a minimal $189,500 in statutory damages. The district court denied plaintiffs' motion for a new trial but awarded them roughly $2.4 million in attorneys' fees.

Defendants appeal from the district court's summary judgment order and the order granting fees and costs. Plaintiffs cross-appeal from the district court's denial of a permanent injunction, several evidentiary rulings, and the denial of a new trial.

We AFFIRM in part, VACATE in part, and REVERSE in part, the grant of summary judgment, and AFFIRM the denial of a permanent injunction; REJECT the challenges to the evidentiary rulings; AFFIRM the denial of plaintiffs' motion for a new trial; VACATE the award of attorneys' fees; and REMAND for further proceedings consistent with this opinion.

_____

MICHAEL S. ELKIN (Erin R. Ranahan, on the brief), Winston & Strawn LLP, New York, NY, for Defendants-Counterclaimants-Appellants-Cross-Appellees.

BARRY I. SLOTNICK (Christian D. Carbone, Tal E. Dickstein, Sarah Schacter, and Priy Sinha, on the brief), Loeb & Loeb LLP, New York, NY, for Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants.

DENNIS JACOBS, Circuit Judge:

In 2002, William Sagan acquired a trove of live concert recordings that included performances by The Rolling Stones, The Who, the Grateful Dead, and many others. At the time, the sellers cautioned that Sagan "may be buying the world['s] greatest private collection [of recordings] that no one will ever hear."

3

App'x at 453. But in 2006, Sagan made those and other recordings available to the world through digital download and streaming services offered for a fee through various websites. Sagan did this through his companies Norton LLC and the Bill Graham Archives, LLC (together with Sagan, "defendants").

In 2015, a collection of music publishers (together, the "Publishers") brought this suit under the Copyright Act, alleging that defendants infringed the Publishers' copyrights in 197 musical works that were performed in the live concert recordings. The Publishers sought about $30 million in damages and a permanent injunction. On March 30, 2018, the United States District Court for the Southern District of New York (Ramos, J.) held on summary judgment that defendants had no valid licenses and therefore infringed each of the musical works and that Sagan was personally liable. The district court denied the Publishers' request for a permanent injunction. Two years later, after a nine-day damages trial, the jury awarded the Publishers $189,500, which was near the minimum statutory damages. The Publishers argued that the minimal award was a rushed and ill-considered result of the encroaching pandemic and moved for a new trial. The district court denied the motion but awarded them roughly $2.4 million in attorneys' fees.

On appeal, defendants challenge the district court's summary judgment rulings and the order granting fees and costs. The Publishers cross-appeal the district court's denial of a permanent injunction, several evidentiary rulings, and its denial of the new trial.

**BACKGROUND**

**I**

Congress has created two types of copyrights in a musical recording. One is for the underlying "musical work," which encompasses the notes and lyrics of a song. See 17 U.S.C. § 102(a)(2). The other is for the "sound recording," which covers the rights to a recording of a particular performance by a particular artist. See id. § 102(a)(7). This case concerns the first type of copyright. (The second type was at issue in a prior litigation.)

A person seeking to make and distribute phonorecords–that is, material objects in which sounds are fixed–of a previously published musical work can do

so by obtaining a compulsory license. See id. § 115(a)(1).[1] One need only provide notice to the owner of the copyright in the musical work (*before* distribution) and pay government-prescribed royalties. See id. § 115(b), (c). Alternatively, a prospective licensee can go directly to the copyright owner or its agent and secure a "negotiated license." Id. § 115(b)(2), (c)(3)(B).

If one seeks to duplicate and sell a sound recording that was "fixed by another," id. § 115(a)(1), rather than make one's own sound recording, there are two additional eligibility requirements for a compulsory license: (i) the sound recording must have been "fixed lawfully," and (ii) the duplication must have been authorized by the copyright owner of the sound recording or, "if the sound recording was fixed before February 15, 1972," the sound must have been fixed "pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such a work in a sound recording." Id. We refer to these as Section 115's "substantive requirements."

---

[1] Section 115 of the Copyright Act was amended in 2018 under the Musical Works Modernization Act and governs conduct engaged in after October 11, 2018. See Act of Oct. 11, 2018, Pub. L. 115-264, 132 Stat. 3676. The conduct in this case occurred before that date, so all citations in this opinion to 17 U.S.C. § 115 are to the pre-2018 version of the statute.

**II**

William Sagan is the president, CEO, and sole shareholder of Norton LLC ("Norton"). In 2002, Norton purchased the archives of the late concert promoter Bill Graham by acquiring Bill Graham Archives, LLC ("Archives"), which housed a collection of audio and audiovisual recordings. The purchase agreement that conveyed the Archives provided that Sagan was acquiring "all Intellectual Property rights . . . to the extent that either Seller or any of its Affiliates possesses such rights." Supp. App'x at 1334. A disclaimer recites that the seller made "*no representations* regarding whether the Assets or their past or future use or exploitation infringed or infringes on the Intellectual Property rights of any person." Id. at 1335 (emphasis added). The seller also told Sagan that he would need to get record company and artist approval to exploit the recordings.

In the ensuing years, defendants continued to acquire recordings of live concerts through other sources. As with the initial purchase from the Archives, these acquisitions came with limited assurances (or none) as to the nature of the intellectual property rights being conveyed, especially as pertaining to artist consent. Defendants were undeterred. Beginning in 2006, these recordings,

7

many of them deemed historic, were made available to the public for download and on-demand streaming through defendants' websites.

About a year after the recordings launched on their websites, defendants sought to obtain licenses to use the musical works by applying for a licensing account with the Harry Fox Agency ("HFA") –a third-party licensing agent that receives Section 115 notices and grants negotiated licenses on behalf of music publishers.[2] For the next three years, defendants worked directly with HFA, obtaining licenses for the musical works, and paying the required royalties. In 2010, defendants hired RightsFlow Inc. to secure the licenses and distribute royalties on their behalf. In 2013, defendants hired MediaNet, Inc. to assume these duties. RightsFlow and MediaNet would either obtain negotiated licenses (directly from the music publisher or from HFA) or compulsory licenses (by

---

[2] Many music publishers employ HFA "as their agent to receive notice of the intention to obtain a compulsory license, and to collect and distribute royalties. Acting on behalf of their clients, HFA waives the statutory notice requirements, negotiates royalty rates at or below the statutory level, and substitutes a quarterly accounting and payment schedule for the monthly schedule prescribed by Section 115." Rodgers and Hammerstein Org. v. UMG Recordings, Inc., No. 00-cv-9322, 2001 WL 1135811, at *2 (S.D.N.Y. Sept. 26, 2001) (Martin, J.).

8

issuing a Section 115 notice). At the same time, challenges arose and accrued, as follows.

In 2006, soon after defendants made the recordings available on their websites, several record labels and a group of musicians sued for infringement of their copyrights in the sound recordings–copyrights separate from musical works. In 2009, after that case settled, defendants entered "Joint Exploitation Agreements" with three major record labels–UMG Recordings Inc., Warner Music, Inc., and Sony Music Entertainment–which generally authorized defendants to exploit through sale and distribution certain sound recordings featuring the record labels' artists, so long as separate licenses were obtained for the musical works. These claims are therefore not at issue in this suit.

In August 2013 (and again in August 2014), plaintiff ABKCO Music, Inc. demanded that defendants cease and desist exploiting an audiovisual recording of a 1981 Rolling Stones concert: "ABKCO has never issued synchronization licenses for the Video" and without such a grant "ABKCO's copyrights in those Compositions have been infringed and continue to be knowingly and willfully infringed." Supp. App'x at 1891 ¶ 64. Around the same time, defendants

received several similar demands from songwriters and publishers of songs performed in the audiovisual recordings featured on their websites.

## III

On May 27, 2015, the Publishers filed this action alleging that defendants infringed their copyrights in 197 musical works by making audio and audiovisual recordings of those works available for download and streaming from their websites without a license to do so.  In total, the Publishers claimed that defendants had illegally exploited more than 1,175 recordings in audio or audiovisual format.  The Publishers sought statutory damages of up to $150,000 for each work infringed and a permanent injunction against the infringing conduct.  Defendants, in turn, sought a declaration that their use of the recordings did not infringe the Publishers' rights and that they may exploit the audiovisual works without obtaining synchronization licenses, which allows a licensee "to synchronize music with visual images in a video, motion picture,

etc." Bridgeport Music, Inc. v. Still N The Water Pub., 327 F.3d 472, 481 n.8 (6th Cir. 2003).

In 2017, following discovery, the district court held on summary judgment that defendants had no valid licenses authorizing the reproduction and distribution of the musical works, had no implied license or estoppel defenses, and had therefore infringed all 197 of the musical works. See ABKCO Music, Inc. v. Sagan, No. 15-cv-4025, 2018 WL 1746564, at *17-20 (S.D.N.Y. Apr. 9, 2018) (Ramos, J.). The district court further held that the infringement of 167 of the works had been willful (there were disputed issues of fact as to the remaining 30 works) and that Sagan was personally liable for direct infringement. See id. at *21-22. However, the district court denied a permanent injunction on the grounds that cash could compensate for any future infringement and that the public has an interest in access to this collection of "iconic" recordings. Id. at *23. (Whether defendants needed to obtain synchronization licenses to exploit the audiovisual recordings was never decided because no party sought summary judgment on that claim.)

The district court later denied defendants' motion for reconsideration, which challenged "nearly every aspect of the [Summary Judgment] Opinion."

11

*ABKCO Music, Inc. v. Sagan*, No. 15-cv-4025, 2019 WL 1382074, at *1 (S.D.N.Y. Mar. 26, 2019) (Ramos, J.).

Trial began on March 2, 2020. At issue was (i) whether defendants willfully infringed the 30 works for which disputed issues of fact precluded summary judgment, and (ii) the damages for infringement of all 197 musical works. The Copyright Act allows the jury to award anywhere between $750 and $150,000 if the infringement is "willful" and between $750 and $30,000 per work if not willful. 17 U.S.C. § 504(c). After nine days of trial, and less than an hour of deliberations, the jury found that the infringement with respect to the 30 works was non-willful and awarded the statutory minimum of $750 per work. For the remaining 167 works that the district court had found to be willfully infringed, the jury awarded $1,000 per work. In total, the jury awarded the Publishers $189,500 of the $30 million that was sought in statutory damages.

The Publishers moved for attorneys' fees and costs under Section 505 of the Copyright Act and separately moved for a new trial, arguing that the jury was "unable to deliberate as the COVID-19 pandemic was worsening in New York City." *ABKCO Music, Inc. v. Sagan*, No. 15-cv-4025, 2021 WL 1101107, at *1 (S.D.N.Y. Marc. 23, 2021) (Ramos, J.). On November 5, 2020, the district court

denied the motion for a new trial but awarded the Publishers approximately $2.4 million in attorneys' fees.

## DISCUSSION

On this cross-appeal, we consider: (I) defendants' challenge to the order granting the Publishers' motion for summary judgment and the order denying defendants' motion for reconsideration; (II) the Publishers' appeal of the denial of a permanent injunction; (III) the Publishers' challenge to several evidentiary rulings and to the denial of a new trial; and (IV) defendants' appeal of the grant of attorneys' fees.

**I**

The summary judgment rulings contested by defendants on appeal are that (A) defendants had no valid license authorizing the reproduction and distribution of the musical works in either audio or audiovisual format, (B) defendants had neither an implied license nor had they any basis for estoppel, and (C) Sagan was liable for direct infringement.  We review these rulings de novo.  See Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 11 F.4th 26, 36 (2d Cir. 2021), cert. granted, 142 S. Ct. 1412 (2022).

**A**

The ruling that defendants infringed the Publishers' copyrights in the musical works was based on three holdings that overlap: (1)  Section 115 compulsory licenses do not cover the use of musical works in audiovisual recordings; (2) defendants failed to satisfy Section 115's substantive requirements for "duplicating a sound recording fixed by another"; and (3) any license that defendants filed *after* distribution of the phonorecords is invalid as a matter of law.  We address each holding in turn.

14

**1**

Of the 197 musical works, "at least" 146 were reproduced and distributed in audiovisual recordings. ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *7. Those actions, defendants argue, fall within the scope of Section 115 compulsory licenses.

Section 115 allows one to "obtain a compulsory license to make and distribute *phonorecords*" of a published musical work. 17 U.S.C. § 115(a)(1) (emphasis added). Whether Section 115 licenses cover exploitation of audiovisual recordings thus hinges on whether those types of recordings fall within the Copyright Act's definition of "phonorecords":

> [M]aterial objects in which sounds, ***other than those accompanying a motion picture or other audiovisual work***, are fixed . . ., and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

Id. § 101 (emphasis added). The district court held that this definition excludes all audiovisual recordings, including recordings of live concerts, and that all of defendants' audiovisual recordings were therefore not covered by any Section 115 license. We agree.

15

In the first sentence of the phonorecords definition, the exclusionary phrase (bolded above) most naturally applies to any recording that includes both sounds *and* images. Defendants contend that one can only "accompany" something that is otherwise separate and would thus limit the meaning of the exclusion to such things as a soundtrack, in which the sound is layered over a motion picture, but not to a recording of a live performance, in which the sound and image are fixed simultaneously. But, given the common and natural meaning of the word, sound can "accompany" an image simultaneously as well as by later addition. Had Congress intended to exclude from the phonorecords definition only soundtracks and other layered sounds, "it would have artfully worded the definition" to reflect that intent.[3] Huddleston v. United States, 415 U.S. 814, 822 (1974).

Defendants contend that their reading of the exclusion is confirmed in the second sentence of the definition because, if "[t]he term 'phonorecords' includes

---

[3] Defendants' reading would also result in different licensing schemes applying to musical works used in motion pictures depending on whether the song was performed on stage (in front of the camera) or in a studio (to be dubbed). Copyright law is complicated, but it is not arbitrary.

the material object in which the sounds are first fixed," then an object is a phonorecord *even if* images are "first fixed" with the sounds. As the district court correctly recognized, however, "the use of the definite article 'the' to reference the concepts 'material objects' and 'sounds' can only be read to refer to these terms as *previously* defined in the first sentence, that is to say, as expressly excluding audiovisual works." ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *11. The second sentence cannot be read to describe a larger set of sounds than the sentence preceding it does.

True, our reading results in some redundancy. That is, it is unclear what the second sentence of the definition adds given that the first sentence already covers all material objects on which the sounds are fixed–regardless of whether they are fixed first, second, or any time thereafter. But "[r]edundancy is not a silver bullet." Rimini Street, Inc. v. Oracle USA, Inc., 139 S. Ct. 873, 881 (2019). The definition of "copies," which appears elsewhere in the Act, has the same structure, similar phrasing, and an analogous second sentence that is likewise

17

redundant without changing the evident meaning of the first sentence.[4]  The second sentence, which appears in the definition of "copies" as well as "phonorecords," does not alter our understanding of the first.

Guided by the plain language of the exclusionary phrase, we conclude that audiovisual recordings are not covered by Section 115 compulsory licenses. Defendants therefore infringed each musical work included in an audiovisual recording.

## 2

The 51 remaining musical works are in audio-only recordings.  The district court concluded that defendants' exploitation of these recordings was unlicensed

---

[4] That definition reads as follows:

> "Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

17 U.S.C. § 101.

because defendants failed to satisfy Section 115's substantive requirements, which apply when a person seeks to "duplicat[e] a sound recording fixed by another." 17 U.S.C. § 115(a)(1). Those requisites (with qualification) are that (i) the sound recording was "fixed lawfully" and that (ii) the making of the phonorecords was authorized by the copyright holder in the sound recording. See id. On appeal, defendants argue that they were not subject to those requirements because the sound recordings they sought to duplicate were fixed by their predecessors and, thus, not *by another.*[5] We agree. While the use of the term "another" is imprecise, defendants' interpretation is supported by logic and legislative history.

When defendants acquired the relevant recordings, they bought any rights that the sellers held in those recordings. The purchase agreement that conveyed the Archives, for instance, provided that the seller was acquiring "all Intellectual

---

[5] While defendants raised this argument for the first time at the summary judgment hearing, we do not consider it waived because the district court chose to address it on reconsideration. See United States v. Young, 998 F.3d 43, 52 n.2 (2d Cir. 2021) ("[W]e do not consider arguments waived when, although not raised below, they were nevertheless passed on by the district court." (internal quotation marks omitted)).

19

Property rights . . . to the extent that either Seller or any of its Affiliates possesses such rights." Supp. App'x at 1334. It is undisputed that the seller would not be subject to the substantive requirements of Section 115. To find that defendants (as purchasers) would be saddled with these additional requirements would impair the transferability of these sorts of works because every trade would thereby impose new burdens and diminish value. Nothing in the text requires that result.

Legislative history militates in the same direction. Under the Copyright Act of 1909, once the copyright owner of a musical composition authorized the work's mechanical reproduction, any other person could make "similar use" of the work on payment to the copyright owner of a two-cent royalty "on each such part manufactured." 17 U.S.C. § 1(e) (1909). The licensee was not expressly required to make its own original sound recording of the musical work or to obtain a license from the lawful owner of the duplicated sound recording.

The 1971 amendments to the Copyright Act for the first time granted copyright protection in "sound recordings"–separate from the musical work–to protect against a recording being duplicated without authorization, i.e., record piracy. In the litigation that ensued, music publishers claimed that one who

duplicates a sound recording made by somebody else is ineligible for a compulsory license.[6]  These suits made their way to various circuit courts, all of which agreed that compulsory licenses for "similar use" do not allow a person to participate in "piracy under the flag of compulsory licensing."  Duchess Music Corp. v. Stern, 458 F.2d 1305, 1311 (9th Cir. 1972); see also Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285 (10th Cir. 1974); Jondora Music Pub. Co. v. Melody Recordings, Inc., 506 F.2d 392 (3d Cir. 1974); Fame Pub. Co., Inc. v. Alabama Custom Tape, Inc., 507 F.2d 667 (5th Cir. 1975).

Later, the 1976 amendments made it possible for a person seeking to duplicate a sound recording "to obtain a compulsory license for the use of copyrighted music under section 115."  H.R. Rep. No. 94-1476, at 108.  But, to prevent piracy, eligibility for a compulsory license was conditioned on "*the owner of the sound recording* . . . authoriz[ing] its duplication."  Id. (emphasis added).  Since piracy concerns are not a consideration when (as here) the owner of the

---

[6] The Third Circuit theorized that "[o]ne reason for these recent cases may be the increased remedies provided to the composers by [the 1971 Amendment]."  Jondora Music Pub. Co. v. Melody Recordings, Inc., 506 F.2d 392, 395 n.8 (3d Cir. 1974).

21

sound recording has transferred its rights to a successor, there is no reason to assume the application of the substantive requirements.

We hold that defendants' recordings were not "fixed by another" for the purposes of Section 115, and therefore vacate the district court's summary judgment ruling to the extent it found defendants to have infringed any of the musical works due to a failure to satisfy that section's substantive requirements.[7]

**3**

The final basis for the district court's infringement finding was defendants' failure to provide timely notice before distributing a phonorecord *and* before obtaining a voluntary HFA license.  The Publishers argue that defendants failed to serve timely notice for at least one recording associated with each musical

---

[7] Both the parties and the district court assumed that if the recordings were "fixed by another," then defendants' recordings would not have been "lawfully fixed" without the artists' consent.  The basis for that assumption is questionable: the two statutes on which the district court relied–the federal and New York anti-bootlegging acts–were enacted many years after the recordings at issue were fixed.  See Pub. L. No. 103-465, 108 Stat. 4809 (1994) (codified at 17 U.S.C. § 1101); 1990 N.Y. Sess. Law Serv. 460 (McKinney).  Unless another law applied at the time the recordings were fixed, then it does not appear to have been unlawful for the concert promoters to record the concerts without the performing artists' consent.

work and that this failure provides an independent basis for affirming the grant of summary judgment. We disagree.

The district court found infringement due to untimely notice only as to the musical works included in the recordings exploited in 2006 because defendants had sent no notices at that time and did not begin obtaining HFA licenses until the following year. See ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *16. As to all other recordings, however, the district court found that "there is a disputed question of fact as to whether and which [notices] were actually submitted after the first download or streaming of a phonorecord and in the absence of an HFA license." Id. So far as we can tell, that disputed fact was not resolved.

We therefore remand to the district court for further factfinding on this issue. In so doing, we acknowledge that the factual dispute may be affected by a threshold legal question that arises from Section 115's command that "failure to serve or file the notice of intention . . . forecloses the possibility of a compulsory license." 17 U.S.C. § 115(b)(2). Specifically, the question is whether one is permanently barred from obtaining a valid compulsory license for a musical work that one had exploited before sending notice and in the absence of a

23

negotiated license.[8] Section 115(b)(4)(A) might alternatively be read to prevent only retroactive issuance of a compulsory license that would otherwise absolve the licensee from suffering the consequence of infringement; in that case, a prospective license could still be acquired, so long as the compulsory licensing requirements are fulfilled. But this issue has not been briefed, so we merely raise it for further consideration in the district court.

\*    \*    \*

To summarize, we agree with the district court's holding that the audiovisual recordings do not fall within the scope of Section 115 compulsory mechanical licenses, disagree with the district court's holding that defendants infringed the remaining musical works by failing to comply with the substantive requirements of Section 115, and reject the Publishers' argument that defendants' failure to serve timely notice provides an independent basis for affirming each

---

[8] Defendants' inability to obtain a compulsory license would not affect any negotiated license they might secure. See Rodgers & Hammerstein, 2001 WL 1135811, at \*5 ("Nothing in Section 115 suggests that Congress intended to limit the ability of either copyright holders or prospective licensees to enter into private agreements that would contain different terms and conditions of the license.").

finding of infringement.  We therefore affirm in part and vacate in part the district court's summary judgment order.

On remand, the district court should reevaluate its infringement findings for all audio-only recordings.  We leave it to the district court to decide whether a new jury trial is needed to resolve any factual disputes.

**B**

Defendants argue that even if they failed to obtain any compulsory or negotiated licenses for the audiovisual recordings, the affirmative defenses of implied license and equitable estoppel preclude findings of infringement.  We disagree.

**1**

We have not yet ruled "on the precise circumstances under which an implied non-exclusive license will be found."  Psihoyos v. Pearson Educ., Inc., 855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012) (Oetken, J.) (internal quotation marks omitted).  Some courts use a narrow test, finding an implied license only where one party "created a work at [the other's] request and handed it over, intending

25

that [the other] copy and distribute it."[9] Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990). Others have applied a more permissive test by which consent "may be inferred based on silence where the copyright holder knows of the use and encourages it." Field v. Google Inc., 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006). We have no occasion to decide which test to adopt, since both require a "meeting of the minds between the parties to permit the particular usage at issue," Psihoyos, 855 F. Supp. 2d at 124 (internal quotation marks omitted), and there has been none here.

Defendants argue that, since they made royalty payments, the Publishers knew how the musical works were being used; and that acceptance of payment

---

[9] The district court cited SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21 (2d Cir. 2000) for the proposition that we have "endorsed" the "narrow" test for finding an implied license. ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *18. But SmithKline did not adopt this test; it merely explained that *other courts* have applied the narrow test for deciding whether an implied license existed. 211 F.3d at 25.

signified the consent required for a meeting of minds. But this reasoning ignores the mechanics of compulsory licensing.

The Publishers grant thousands of compulsory licenses annually. Not by choice; it is (as the name says) compulsory. Payment notifies the Publishers that a compulsory license has issued, but it does not communicate how the license will be used. The reasonable assumption is that use will be in accord with the requirements of Section 115, which, at the least, means that the musical works will not be used in any audiovisual recordings. The same assumption applies to any negotiated license in this case. The HFA licenses "state that Defendants seek licenses for 'phonorecords' as 'authorized pursuant to 17 U.S.C. § 115," ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *20, which conveys the clear impression that the musical works would be used in sound recordings only.

Defendants further argue that ABKCO's cease-and-desist letters show that the Publishers knew that the musical works were being used in audiovisual recordings. But those letters show only that the Publishers knew about a single Rolling Stones recording, not any of the rest (of which there were over a thousand). And, at the risk of being obvious, the demand that defendants *stop*

27

exploiting that single recording cannot be construed as a meeting of the minds about anything.

**2**

Nor can defendants establish a defense by equitable estoppel. That affirmative defense "is properly invoked where the enforcement of rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." Veltri v. Building Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004) (internal quotation marks omitted). To prevail on an estoppel defense in the copyright context, a defendant must show that:

> (1) plaintiff had knowledge of the defendant's infringing conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment.

SimplexGrinnell LP v. Integrated Sys. & Power, Inc., 642 F. Supp. 2d 167, 194 (S.D.N.Y. 2009) (Lynch, J.) (citation omitted) (alterations adopted).

But as the district court concluded, there is no showing that the Publishers knew about the infringing conduct. See ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *20. True, ABKCO knew that defendants were exploiting a recording of The Rolling Stones, which is why ABKCO demanded that defendants stop exploiting it. But, even as to that single recording, defendants are unable to show that the cease-and-desist letters "suggest authorization" or anything of the sort.

C

Defendants next challenge the district court's holding that Sagan was liable for direct infringement. Direct liability requires "volitional conduct" that "causes" the copying or distribution. Zappa v. Rykodisc, Inc., 819 F. Supp. 2d 307, 315 (S.D.N.Y. 2011) (Pauley, J.) (citation omitted). That is, direct liability attaches only to "the person who actually presses the button." Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008). In UMG Recording, Inc. v. Escape Media Group, for example, two executives were directly liable because they "personally uploaded copyrighted sound recordings to [their

29

website]." No. 11-cv-8407, 2014 WL 5089743, at *26 (S.D.N.Y. Sept. 29, 2014) (Griesa, J.).

Even if a copyright is not infringed by a corporate officer's own hand, a corporate officer with an obvious and direct financial interest, and a power of supervision to effect an infringement, may be vicariously liable. See EMI Christian Music Grp. v. MP3tunes, LLC, 844 F.3d 79, 99 (2d Cir. 2016). But the Publishers pled only direct liability. The district court recognized as much and acknowledged that summary judgment would have to be premised "on that basis alone." ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *22 n.33.

However, the district court went on to recite the standard for vicarious liability instead, and to apply that standard to conduct that (with one arguable exception) could not give rise to direct liability. See id. at *22. As to the exception: Sagan's Chief Technology Officer stated in his deposition that "it was Sagan who instructed him as to 'which concerts to make available for download or not,' . . . and made plans 'to start digitizing tape recordings with an eye towards making them available on a public website.'" Id. (citations omitted). But that passage involves only instructions and plans; there is no evidence that

30

Sagan is the one who "actually presse[d] the button." <u>Cartoon Network</u>, 536 F.3d at 131.

We therefore reverse the district court's order granting judgment against Sagan.

**II**

The Publishers challenge the district court's refusal to issue a permanent injunction.[10]  We review this decision for abuse of discretion.  See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 254 (2d Cir. 2015).

Under the Copyright Act, a court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  The test for determining when to grant such equitable relief requires the plaintiff to demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

---

[10] Because we have vacated the district court's order with regards to infringement on the audio-only recordings, the permanent injunction issue is relevant only with respect to the audiovisual recordings.

The district court found that the first two factors weigh against an injunction since the Publishers can be made whole with cash. We agree. The Publishers argue that their damages are impossible to quantify because defendants' infringing conduct "threatens [their] relationships with . . . existing licensees, and undermines their negotiating leverage with prospective licensees." Plaintiffs-Appellees Br. at 69-70. But they provide no factual (or theoretical) support that would allow us to credit that claim. True, "[h]arm can be irreparable" where, "absent an injunction, the defendant is likely to continue infringing the copyright." Broad. Music, Inc. v. Pamdh Enters., Inc., No. 13-cv-2255, 2014 WL 2781846, at *4 (S.D.N.Y. June 19, 2014) (Wood, J.). But that factor is not decisive when (as here) the record gives no indication that defendants will continue their infringing conduct.

The third factor tilts in the same direction. Defendants invested tens of millions of dollars to acquire a library of live concert recordings and have devoted two decades to building a business around those recordings. The Publishers claim an offsetting hardship if they had "to commence litigation for each future violation," whereas it would be no cognizable hardship if defendants were compelled "to comply with their legal duties." Broad. Music, Inc. v. Prana

33

Hosp., Inc., 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) (Engelmayer, J.).  But the Publishers have the resources to commence future litigation if needed, and if they do so successfully, they might collect fees and costs under Section 505 of the Copyright Act.

The final factor also favors defendants because the public has an interest in accessing "iconic" recordings of historical importance.  ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *23.  The Publishers rely on a case in which we explained that the public has an interest in "protecting copyright owners' marketable rights to their work and the economic incentive to continue creating."  WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 287 (2d Cir. 2012).  But WPIX affirmed an injunction against "streaming [the] plaintiffs' copyrighted television programming over the internet live and without their consent."  Id. at 277.  We concluded that a preliminary injunction would not disserve the public interest because "[p]laintiffs' desire to create original television programming surely would be dampened if their creative works could be copied and streamed over the Internet," and because "the public will still be able to access plaintiffs' programs through means other than [the defendant's] Internet service."  Id. at 288.

34

This case is distinguishable in every way that matters. The concert recordings at issue were made primarily from the 1960s to the early 2000s; so no ongoing stream of new content is at stake. Even if it were, the Publishers fail to explain how the denial of a permanent injunction would curb creativity. See Salinger v. Colting, 607 F.3d 68, 82 (2d Cir. 2010) ("The object of copyright law is to promote the store of knowledge available to the public."). Surely it would have no impact on concert performances themselves, or the desire to preserve them.

**III**

After a nine-day damages trial, the jury awarded the Publishers the near minimum of their statutory entitlement–about $30 million less than what they had sought. The Publishers now want a retrial on the ground that the district court abused its discretion with respect to a series of evidentiary rulings, and in its denial of the Publishers' motion for a new trial. We address these arguments in turn.

**A**

Three evidentiary rulings are contested.

First: The district court admitted into evidence payments that defendants made to non-parties and for works on which the Publishers did not sue. The district court concluded that the payments were relevant to the "conduct and attitude of the parties" and the "willfulness" or state of mind of defendants, and it issued a limiting instruction to that effect. App'x at 757. On appeal, the Publishers contend that this evidence was irrelevant and that any probative value was outweighed by the danger of misleading the jury as to the sum defendants paid for the musical works at issue. But the Publishers waived this argument when their counsel stated that he was "fine" with such evidence being admitted so long as a limiting instruction was given, as it was. Id. at 766.[11]

---

[11] The Publishers also argue that defendants' list of checks–a list created specifically for the litigation–should have been excluded "under the Best Evidence Rule," and because "there was a dispute as to which checks had actually been cashed." Plaintiffs-Appellees' Reply Br. at 7. The Publishers first raised this argument on appeal in their reply brief, and thereby waived it. See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").

Second: The district court admitted into evidence the Joint Exploitation Agreements that defendants entered with Sony, Warner, and UMG. The Publishers' motion in limine to exclude the agreements from evidence was denied "subject to reopening as events unfold during the course of the trial." Id. at 755. On appeal, the Publishers argue that the district court abused its discretion because admitting these agreements conflicted with several of its other rulings.

This argument too was not preserved. An evidentiary issue is preserved in limine only if it was (among other things) "ruled upon by the court without equivocation." United States v. McDermott, 245 F.3d 133, 140 n.3 (2d Cir. 2001). The in limine ruling left the door ajar for objections at trial, and the Publishers did not object when these agreements were introduced at trial. The Publishers thus waived the argument they now advance on appeal. See Barlow v. Liberty Maritime Corp., 746 F.3d 518, 529 (2d Cir. 2014) ("[Plaintiff] raised this objection in limine, but failed to raise it at trial, and specifically withdrew his objection in his post-trail briefing. We therefore need not consider it.").

Third: The Publishers sought to question Sagan about a June 2015 article published by defendants' licensing agent, MediaNet, which stated that, to exploit

37

music in audiovisual format, "[s]ynchronization licenses for the musical composition in each track used must also be obtained from the appropriate music publisher(s)." Supp. App'x at 2107.  The district court precluded this hearsay statement after concluding that it was not made within "the scope of [MediaNet's] agency with respect to defendants."  Id. at 661.

The Publishers contest this ruling by pointing to the testimony of Sagan's Chief Technology Officer that MediaNet provided "[a]dvice with respect to what licenses were required."  Id. at 657.  But this testimony was vague and did not necessarily relate to synchronization licenses.  Moreover, the full record shows that MediaNet's agency role was largely limited to calculating what defendants owed and making the requisite royalty payments.  The district court did not abuse its discretion in excluding this evidence.

**B**

A motion for a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Such a motion ordinarily should be denied "unless the trial court is convinced that the jury has reached a seriously erroneous result or that

38

the verdict is a miscarriage of justice." Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998) (citation omitted).  The Publishers contend a new trial should have been granted because the pandemic resulted in a rushed and ill-considered jury verdict.  We disagree.

When trial began on March 2, 2020, news of the pandemic was spreading.  On March 10, the district court told counsel that "we may be surrounded by the National Guard tomorrow morning, . . . .  I want to get this done as soon as possible, okay?"  App'x at 1889.  The next day, the district court told counsel that "[t]he world is falling apart around us, and I would like to get this done . . . it would be very, very helpful to get this done as soon as possible."  Supp. App'x at 791.

On March 12, 2020, New York's mayor declared a state of emergency.  That same day, Juror Five asked to speak in open court.  The juror stated that the jury intended to do their job and "do[] it fairly," but that:

> We have been coming here for two weeks, all of us in this room.  We have been exposing ourselves.  Whether we know it or not, it's happening.  And, quite frankly, this matter doesn't seem all that important compared to lives at stake, such as my mom who has lupus.  She has a very compromised immune system. . . .  We are here to decide damages and money.  And, quite frankly, money, to me,

is not worth the life of my mother or any of the lives of the jurors in there who also there are several who are older, and that's my concern.

App'x at 797-98. The district court ruled sua sponte that the juror's comments

did not warrant his exclusion. Neither party objected.

Prior to deliberation later that day, the district court assured the jury:

"Now that the case is in your hands, you can stay as long as you wish. I'm

happy to stay with the usual schedule of 9:30 to 2:30, but if you wish to stay

longer, I'll leave that entirely up to you." Id. at 935. The jury reached a verdict in

less than an hour and without reviewing any trial exhibits. It awarded the

Publishers $189,500 in statutory damages, and made findings as to willful

infringement with respect to 30 recordings.

The Publishers' motion for a new damages trial argued that "the trial was

fundamentally unfair because the jury was allegedly unable to deliberate as the

COVID-19 pandemic was worsening in New York City." ABKCO Music, Inc. v.

Sagan, 500 F. Supp. 3d 199, 205 (S.D.N.Y. 2020) (Ramos, J.), judgment entered,

40

No. 15-cv-4025, 2021 WL 761852 (S.D.N.Y. Feb. 26, 2021). The Publishers claim an abuse of discretion for three reasons.

First: A new trial was ordered in the supposedly analogous case of Lucas v. American Manufacturing Co., 630 F.2d 291 (5th Cir. 1980), in which the jury returned a verdict within 45 minutes after three days of trial, and shortly before a hurricane made landfall near the courthouse. Id. at 293. But Lucas was materially different. There, the judge asked the jurors to render a verdict in fifteen minutes, see id., whereas the judge in this case told the jury that it could "stay as long as [it] wish[ed]." Supp. App'x at 935. And while Lucas held that there had been no evidentiary basis for the jury's award, which was less than half the amount to which the defendant stipulated prior to trial, 630 F.2d at 293, the jury in this case awarded damages within the permissible statutory range.

Second: The Publishers cite Juror Five's concerns. But those concerns revealed only an uneasiness to proceed in the face of the pandemic, not an unwillingness to engage in fair and thorough deliberations. Juror Five made this plain: "I'm not trying to get a hung jury. I want to do my job. I want to do my duty. So does everyone in this room, and we plan on doing it fairly." ABKCO, 500 F. Supp. 3d at 208.

41

Third: The Publishers argue that the effect of the pandemic on the trial is evidenced by the low damages award relative to the Publishers' expectations. As the district court explained, however, the Publishers failed to "persuasively draw any connection between the potential impact of the COVID-19 pandemic and the specific damages awarded," or explain why it would have been easier for a rushed jury to award damages on the lower side of the scale, as opposed to in the middle or on the higher end. Id. at 210.

**IV**

The district court awarded the Publishers roughly $2.4 million in attorneys' fees primarily on the ground that defendants acted unreasonably when they claimed (without evidence) that artists had consented to the recording and exploitation of their concert performances and, relatedly, because defendants' infringement was willful as to a large portion of the recordings. See ABKCO, 500 F. Supp. at 213-15. The premise of that award is that (according to the parties and the district court) the substantive requirements of Section 115 incorporate the requirement for performer consent. The award therefore

42

conflicts (at least in part) with our holding that defendants were not subject to Section 115's substantive requirements.

We therefore vacate the district court's grant of attorneys' fees and remand for reconsideration in light of this opinion.

## CONCLUSION

To summarize:

    (1) We AFFIRM the rulings in the summary judgment order to the extent they: (a) held that defendants failed to obtain a license for any of the audiovisual recordings, and therefore infringed the audiovisual works; (b) concluded that defendants had no valid affirmative defense; and (c) declined the Publishers' request for a permanent injunction.

    (2) We VACATE the ruling in the summary judgment order that defendants infringed the musical works used in the audio-only recordings by failing to comply with Section 115's substantive requirements.

    (3) We REVERSE the ruling on summary judgment that Sagan was liable for direct infringement.

    (4) We REJECT the challenges to evidentiary rulings.

    (5) We AFFIRM the order denying the motion for a new trial.

    (6) We VACATE the award of attorneys' fees.

(7) We REMAND the case for further proceedings consistent with this opinion.